IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**OREGON NATURAL DESERT ASS'N**,

                         Plaintiff,

               v.

**BUREAU OF LAND MANAGEMENT,
KENNY McDANIEL,** Burns District
Manager, BLM, **JOAN SUTHER,** Field
Manager, Andrews Resource Area, BLM, and
**INTERIOR BOARD OF LAND
APPEALS,**

                         Defendants.

Civil Case No. 08-1271-KI

OPINION AND ORDER

          Peter M. Lacy ("Mac")
          Oregon Natural Desert Association
          917 SW Oak Street, Suite 408
          Portland, OR 97205

Page 1 - OPINION AND ORDER

David H. Becker
Law Office of David H. Becker, LLC
917 SW Oak Street, Suite 409
Portland, OR 97205

       Attorneys for Plaintiff

S. Amanda Marshall
United States Attorney
District of Oregon
Stephen J. Odell
Assistant U.S. Attorney
U.S. Attorney's Office
1000 SW Third Ave., Suite 600
Portland, OR 97204-2902

       Attorneys for Defendants

KING, Judge:

The Oregon Natural Desert Association ("ONDA") brings suit against: the Bureau of Land Management; Kenny McDaniel, the Burns District Manager for the BLM; Joan Suther, the Field Manager for the Andrews Resource Area for the BLM; and the Interior Board of Land Appeals ("IBLA") (collectively, the "BLM"). ONDA challenges the BLM's plan to control juniper expansion on Steens Mountain (the "Juniper Treatment Project"), as set forth in the BLM's North Steens Ecosystem Restoration Project Environmental Impact Statement ("the EIS"), under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-61, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-87, and the Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), 16 U.S.C. §§ 460nnn-460nnn122. Pending before me are ONDA's Motion for Summary Judgment [47] and the BLM's Cross-Motion for Summary Judgment [63]. For the following reasons, I grant in part and deny in part both motions.

Page 2 - OPINION AND ORDER

ONDA's Motion for Temporary Restraining Order/Motion for Preliminary Hearing [46] is denied as moot, and its Motion to Supplement the Administrative Record [86] is granted given the BLM's agreement to include in the administrative record the materials requested by ONDA.

## BACKGROUND

I.    Procedural Background

ONDA filed its complaint in October 2008, but the Court granted repeated extensions of the case deadlines to aid the parties' settlement negotiations.  In the meantime, the BLM issued task orders, bid and contract documents, and notices to proceed on some portions of the Project. Ultimately, the parties were unable to reach agreement and ONDA filed a Motion for a Temporary Restraining Order/Preliminary Injunction, along with a Motion for Summary Judgment.  The parties stipulated to a stay of the TRO/Preliminary Injunction motion when the BLM agreed not to engage in project activities until at least August 31, 2011.  It also promised not to undertake any further project-related tasks on or after September 1 unless it first notifies ONDA and the Court two weeks in advance.  In addition, at the BLM's request, the court entered a minute order [61] indicating "no party may rely on the stipulation in seeking an award of attorneys' fees or costs."

ONDA's opening brief in support of its motion for summary judgment revealed a concern that the BLM has failed to adequately address the Juniper Treatment Project's short-term effects on sage-grouse in light of new information, thereby triggering the BLM's duty to prepare a supplemental EIS.  First, in November 2008 the BLM received an application for approval to construct a transmission line across nine miles of public lands, which would connect  to the national grid wind turbine generators proposed for installation on private land.  Additionally, the

U.S. Geological Survey released recent research about sage-grouse in a November 2009

publication called <u>Ecology and Conservation of Greater Sage-grouse:  A Landscape Species and</u>

<u>its Habitat</u> (the "Sage-Grouse Monograph").  Finally, in March 2010, relying on the Sage-Grouse

Monograph, the United States Fish and Wildlife Service ("FWS") concluded the sage-grouse

warranted listing as an endangered or threatened species under the Endangered Species Act

("ESA"), but its listing was precluded by higher priority listing actions; accordingly, the sage-

grouse is considered a candidate species for federal listing.  12-Month Findings for Petitions to

List the Greater Sage-Grouse (*Centrocercus urophasianus*) as Threatened or Endangered

(hereinafter, "Listing"), 75 Fed. Reg. 13,910 (Mar. 23, 2010).

After ONDA filed its opening brief, the BLM issued a Determination of NEPA Adequacy

("DNA") discussing ONDA's concerns and concluding a supplemental EIS was not necessary.  It

found "the information, as a whole, emphasizes what BLM had already noted in the FEIS:

agencies should focus on maintaining good habitat and restoring potential (but currently

marginalized) sage-grouse habitat, using methods that include addressing juniper encroachment."

NS-IMP 1270.[1]

ONDA then filed a supplemental complaint to account for events that had occurred since

filing its complaint in 2008, including the BLM's issuance of the DNA.  In its supplemental

complaint, ONDA seeks injunctive relief, asking the court to set aside the North Steens

Ecosystem Restoration Project, and subsequent contracts for juniper cutting which implement the

project, for violations of NEPA, FLPMA, and the Steens Act.  ONDA recognizes in its complaint

---

[1] I cite to the administrative record [29] as AR, the supplemental administrative record
[53] as SAR, and the implementation record [43, 66, 72, and 91] as NS-IMP.  ONDA cites the
latter as IR.

the benefits of "focused removal of young, invading junipers [which] may help restore certain habitat types on Steens Mountain[,]" but asserts the Juniper Treatment Project "will destroy wilderness values and sagebrush habitat across this remarkable landscape."  Supp. Compl. ¶ 1.

II.    The Planned Project

The BLM issued its final EIS and Record of Decision ("ROD") on the North Steens Ecosystem Restoration Project in September 2007, adopting the Full Treatment Alternative outlined in the draft EIS excluding treatments in the Steens Mountain Wilderness Area.  The purpose of the project is to "reduce juniper-related fuels and restore various plant communities through restoration of habitat" on approximately 336,000 acres in the Steens Mountain Cooperative Management and Protection Area ("CMPA") and Andrews Management Unit of the Andrews Resource Area.  AR 585, 583.  The CMPA was established by the Steens Act and is comprised of both public and private land covering most of Steens Mountain.  According to the BLM, juniper, although native, has expanded its range and density and dominates other vegetation such as mountain big sagebrush, quaking aspen, shrubs and grasses and puts at risk mountain mahogany and old-growth juniper.  The BLM believes the juniper expansion is due in large part to fire suppression, historic grazing practices, and climatic changes.  The EIS is tiered to, and incorporates by reference, the Andrews Management Unit/Steens Mountain CMPA Resource Management Plans (RMPs), the Final EIS associated with each, and the accompanying RODs.

The planned techniques, or treatments, of juniper removal include:  prescribed fires (including broadcast burning), cutting down and girdling trees, fencing, seeding, and planting. To execute the project, the BLM anticipates needing to grade, gravel, and install culverts or rock

crossings to move machinery to and from project units, and improve (then reclaim) closed roads

to serve as fire lines.  Off-road vehicles may be used to treat remote areas, including Wilderness

Study Areas ("WSAs").  The project is not specific as to where treatments will occur or for how

long the project will continue, but the BLM will focus on the "juniper belt" existing roughly

between 4,500 feet and 7,200 feet and anticipates a decades-long process.  AR 583.  The BLM

describes the project as a "landscape-level project" that will be implemented through an

"adaptive management" approach, which requires identifying objectives, monitoring to evaluate

success in meeting outcomes, and changing the approach if success is not achieved.  AR 583.  It

imposes Project Design Elements ("PDEs"), or mitigation measures, which the BLM believes

will minimize negative impacts to resources.

In its comments on the EIS, ONDA expressed concern with the BLM's proposed methods

of juniper removal and the size of the project.  While ONDA thought "some degree" of juniper

removal was warranted, it worried about impacts to sage-grouse and sagebrush habitat as well as

the effect on wilderness and roadless areas.  AR 3136-40.  ONDA appealed the BLM's final

decision, and the IBLA affirmed the BLM's decision in June 2008.

The BLM reports considerable support for the project.  The Steens Mountain Advisory

Council, which is an advisory board to the BLM on managing the CMPA, unanimously

recommended the project.  Oregon Department of Fish and Wildlife ("ODFW"), Oregon

Department of Environmental Quality, FWS, Harney County Soil and Water Conservation

District, the Burns Paiute Tribe, and the Eastern Oregon Agricultural Research Center are

cooperating agencies on the project.  Backcountry Hunters and Anglers, Trout Unlimited, Sierra

Club, Izaak Walton League, DEQ and FWS have all expressed support for the project.  Finally,

ODFW, the agency responsible for managing sage-grouse in the state, expressed support for the project in 2007 and again in 2011.

III.    Sage-Grouse

In order to understand ONDA's challenge, some background information about the sage-grouse is necessary.  Sage-grouse breed in areas known as leks from early/mid-March to the end of April.[2]  Leks are typically characterized by low grasses surrounded by sagebrush.  The female sage-grouse moves away from the lek to build her nest, between two and five miles and sometimes 12.5 miles or more, and begins nesting in early April until the end of May, but sage-grouse typically come back to the same lek year after year.  The lek can be placed "opportunistically" anywhere, so long as it is near or within nesting habitat.  Listing, 75 Fed. Reg. at 13,915.  Once the chicks are hatched in May, the birds begin to move upland to wetter sites where they eat flowering plants and insects, but by late summer and fall the birds rely entirely on sagebrush for their sustenance.  Sage-grouse reproduce at a low rate.

FWS's March 2010 conclusion that sage-grouse warranted listing was based in part on the fact that the species now inhabits about half of their historic range; twenty percent of the range-wide distribution of sage-grouse and habitat is in Oregon.  In fact, one of the two remaining "strongholds" of sage-grouse habitat in North America includes this project area.  Id. at 13,958; ONDA's Ex. 1 at 26-27, 128-29 [48].  Leks are spread out around Steens Mountain, and fourteen of the sage-grouse leks are within the project area, located in areas away from roads and other human disturbances.  AR 521 (map of leks on mountain), 547 (map of leks in project

---

[2]Visit www.westernwatersheds.org/wildlife/sage-grouse to watch the sage-grouse courtship dance.

area), 650 (describing 14 leks).  The BLM points out FWS believes juniper expansion negatively

affects sagebrush and, correspondingly, sage-grouse, and questions whether agencies are

proceeding quickly enough to stop juniper expansion.  Listing, 75 Fed. Reg. at 13,937-38.

ODFW also comments in a document called the Greater Sage-Grouse Conservation Assessment

and Strategy for Oregon ("ODFW Strategy"), which has been updated as recently as March 2011,

that wildfire and juniper encroachment "are the two largest factors causing sagebrush habitat loss

in Oregon."  SAR 55.

## LEGAL STANDARDS

ONDA's action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§

701-706.  The "mechanism" for bringing the legal issues before the Court is summary judgment

under Federal Rule of Civil Procedure 56.  Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769-70

(9th Cir. 1985).  However, the scope of the court's review under the APA is limited; the court

may overturn an agency action only if the action was "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); Marsh v. Or. Natural

Res. Council, 490 U.S. 360, 377 (1989); Blue Mountains Biodiversity Project v. Blackwood, 161

F.3d 1208, 1211 (9th Cir. 1998).

In determining whether an agency decision is arbitrary and capricious, courts "consider

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  Marsh, 490 U.S. at 378.

> A decision is arbitrary and capricious if the agency "has relied on factors which
> Congress has not intended it to consider, entirely failed to consider an important
> aspect of the problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not be ascribed to
> a difference in view or the product of agency expertise."

Nw, Envtl. Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 687 (9th Cir. 2007) (quoting

Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983)).  The agency must "articulate a rational connection between the facts found and the

conclusions made."  Or. Natural Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir. 1997).

Review under this standard is narrow, and the court may not substitute its judgment for the

judgment of the agency.  Nw. Envtl. Def. Ctr., 477 F.3d at 687.

## DISCUSSION

ONDA's challenge breaks down into several discrete parts:  (1) the BLM violated NEPA

by failing to issue a supplemental EIS that takes into consideration the new research about sage-

grouse and the proposed wind project near several leks; (2) the BLM violated NEPA by changing

the Juniper Treatment Project; (3) the BLM violated NEPA by failing to conduct the proper

environmental review of site-specific treatments; (4) the BLM violated FLPMA by authorizing

juniper treatments, vehicle use and road maintenance in WSAs; and (5) the BLM violated the

Steens Act by allowing off-road vehicles in WSAs and new road construction.

I.      NEPA-Related Arguments

Before diving into the substance of ONDA's NEPA challenge, I must resolve some

preliminary issues

A.      Preliminary Arguments

1.      Judicial Estoppel

ONDA seeks to hold BLM to a position the agency took in another project after

reviewing the same sage-grouse publications that ONDA argues trigger the BLM's duty to

supplement the EIS here.  Specifically, in managing livestock in Louse Canyon, the BLM

considered the Sage-Grouse Monograph, as well as a draft revision of the ODFW Strategy, a

declaration interpreting the Sage-Grouse Monograph prepared by ONDA's expert, David S.

Dobkin, Ph.D., and FWS's 12-Month Finding on the sage-grouse.  "[I]n light of this new

information" the BLM concluded it would "not be prudent" to proceed without undertaking

additional NEPA analysis, making moot ONDA's challenge to livestock grazing and related

projects in Louse Canyon.  ONDA's Resp. and Reply 7 and attached Ex. 1, at 2 [74]; Or. Natural

Desert Ass'n v. Freeborn, No. 06-1311-MO (D. Or. Mar. 21, 2011).  ONDA suggests the BLM is

judicially estopped from arguing in this case that the same publications do not require additional

NEPA analysis.

        "Judicial estoppel is an equitable doctrine that precludes a party from gaining an

advantage by asserting one position, and then later seeking an advantage by taking a clearly

inconsistent position."  Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir.

2001).  I do not view the BLM's two decisions as "clearly inconsistent" with each other.  The

Louse Canyon and Juniper Treatment Projects are far too different from each other to estop the

BLM from taking a position in one project that is at odds with its approach in another project.

Furthermore, a decision about when a supplemental environmental analysis is necessary is too

fact-dependent to hold the BLM to a position it took in another project.  In sum, judicial estoppel

does not apply here.

                    2.    Timing and Sufficiency of the Determination of NEPA Adequacy

        After ONDA initiated this litigation, the BLM issued a DNA discussing ONDA's

concerns and concluding the EIS "fully covers the proposed action and constitutes BLM's

compliance with the requirements of the NEPA." NS-IMP 1275. ONDA argues the BLM

should have issued its DNA earlier and that the DNA does not consider the factors necessary to

make a determination about whether the new information is, in fact, significant.

At the outset, both parties agree that in assessing the BLM's decision not to supplement

the EIS I am not limited to reviewing the administrative record as it existed at the time of the EIS

and ROD. Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir. 2000) (explaining

that when an entity seeks to compel the preparation of supplemental environmental review

documents–an action unlawfully withheld–the court is not limited to an administrative record

documenting the process of achieving a final action). Additionally, the DNA is not a NEPA

document, but is the tool BLM used to evaluate the significance of the new information. Idaho

Sporting Congress Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000).

ONDA contends, however, that the BLM was aware of the Sage-Grouse Monograph as of

November 2009, was aware of FWS's warranted conclusion under the ESA as of March 2010,

had Dr. Dobkins' declaration in the Louse Canyon matter since November 2010, and had issued

a draft EIS on the transmission line energy project in July 2010. Since the BLM knew about this

new information, it was required to evaluate whether the information was significant enough to

warrant a supplemental EIS. See Warm Springs Dam Task Force v. Gribble, 621 F.2d 1017,

1023-24 (9th Cir. 1980) ("When new information comes to light the agency must consider it,

evaluate it, and make a reasoned determination whether it is of such significance as to require [an

SEIS]."). The BLM did not issue its DNA until June 17, 2011.

Since ONDA filed its initial complaint in 2008 and the parties have been negotiating a

settlement for approximately 18 months, and given that I will be reviewing the BLM's eventual

Page 11 - OPINION AND ORDER

determination about the significance of the information as set forth in its DNA, I do not rule on

whether any delay in issuing the DNA was a violation of NEPA.

ONDA also asserts that the DNA should have recited the factors used to determine the

"significance" of an action.  The BLM contends in a footnote that these factors are only relevant

to an initial EIS and not a supplemental EIS.  Contrary to the BLM's understanding, in assessing

whether new information "will 'affec[t] the quality of the human environment' in a significant

manner or to a significant extent not already considered," the regulatory definition of

"significantly" requires the BLM to consider the context and intensity of the proposed project

and its impacts.  40 C.F.R. § 1508.27; see Marsh, 490 U.S. at 374 n.20.  Context is defined to

mean the setting of the proposed action and intensity is the severity of the impact.  Intensity

factors include: beneficial and adverse impacts; highly uncertain or unique risks; and impacts

which are significant cumulatively but not individually.  Id. at § 1508.27(b)(1), (5), (7).

However, ONDA cites no case, and I could find none, requiring the BLM to recite the criteria in

its DNA.

As for whether the DNA evaluated those factors, I find the DNA considered the context

by appraising the sage-grouse needs in Oregon, in a cumulative effects area about twice the size

of the project area, and in the project area itself.  It also considered the intensity factors,

especially the short-term and long-term effects and the obligation to meet sage-grouse needs.  See

NS-IMP 1224 (biologist's opinion incorporated into DNA in which short-term effects are

described).  On balance, relying on the ODFW Strategy, the DNA concludes that "[e]ven

considering fire and other effects to available sage-grouse habitat throughout Oregon, . . . the

Page 12 - OPINION AND ORDER

need to address juniper encroachment remains the same[.]" NS-IMP 1271. In sum, I find

nothing wrong either with the timing or the technical contents of the DNA.

        3.      <u>Standard for Evaluating the Need for a Supplemental EIS</u>

        The parties disagree about which standard applies in evaluating whether the BLM was

required to prepare a supplemental EIS. Both parties agree that the BLM must prepare a

supplemental EIS when it "makes substantial changes in the proposed action that are relevant to

environmental concerns" or when "significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts" occur. 40 C.F.R.

§ 1502.9(c)(1)(i) and (ii); <u>Friends of the Clearwater</u>, 222 F.3d at 556-59. Where the parties split

is in their interpretation of <u>Klamath Siskiyou Wildlands Ctr. v. Boody</u>, 468 F.3d 549, 561 (9th

Cir. 2006). ONDA argues that this case imposes the same standard for a supplemental EIS as an

initial EIS, while the BLM contends that the agency in <u>Boody</u> failed to prepare any

environmental analyses at all, whether in the form of an EA or EIS, making supplementation not

an issue there.

        I need not sort out whether <u>Boody</u> changed the standard in the Ninth Circuit because the

Supreme Court's decision in <u>Marsh</u> provides the best guidance. That case explains that "whether

to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first

instance: If there remains 'major Federal actio[n]' to occur, and if the new information will

'affec[t] the quality of the human environment' in a significant manner or to a significant extent

not already considered, a supplemental EIS must be prepared." 490 U.S. at 374. Further, the

BLM must re-examine its decision when the EIS "rests on stale scientific evidence . . . and false

assumptions[.]" <u>Seattle Audubon Soc'y v. Espy</u>, 998 F.2d 699, 704 (9th Cir. 1993). It must take

a "hard look at the environmental effects of their planned action, even after a proposal has received initial approval." Marsh, 490 U.S. at 373, 385. However, "[t]hough a party may cite studies that support a conclusion different from the one the [agency] reached, it is not [the court's] role to weigh competing scientific analyses." Ecology Ctr. v. Castaneda, 574 F.3d 652, 659 (9th Cir. 2009). Failure to issue a supplemental EIS when these criteria are met is arbitrary, capricious and not in accordance with NEPA.[3]

> B.    Whether a Supplemental EIS is Required

ONDA argues that several watershed events have occurred since the BLM issued its EIS and ROD. The first is FWS's decision that sage-grouse warrant ESA protection based on the new research produced by 38 experts and contained in the Sage-Grouse Monograph, and the second is a proposal for an energy transmission line across north Steens Mountain.

> 1.    The Sage-Grouse Monograph

ONDA argues that the BLM failed to take the requisite "hard look" in assessing the significance of the information contained in the Monograph.[4] Relying on Dr. Dobkin's interpretation of the Monograph, ONDA suggests the BLM understates the impact of the Juniper

---

[3]The court does not review the "reasonableness" of an agency's decision not to supplement an EIS, contrary to ONDA's argument. ONDA's Resp. and Reply 7. Marsh makes it clear that, in these circumstances, the court reviews the agency's decision under an arbitrary and capricious standard of review. 490 U.S. at 377; see also Cal. ex rel. Lockyer v. U.S. Dept. of Agric., 575 F.3d 999, 1011 (9th Cir. 2009) (reasonableness standard applies to disputes about legal questions). Regardless, as noted by Lockyer, "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." 575 F.3d at 1012 (quoting Marsh, 490 U.S. at 377 n.23).

[4]The entire Sage-Grouse Monograph is not part of the administrative record. ONDA submitted some of the chapters as Exhibit 1 to its Memorandum in Support of its Motion for Summary Judgment [48]. The Knick and Hanser study, discussed below, is also at NS-IMP 1234.

Treatment Project on sage-grouse.  According to ONDA, the Monograph demonstrates that sage-grouse are affected by the kind of disturbance that would be caused by the Juniper Treatment Project more than previously believed, and even when the disturbance occurs some distance away.  See Dobkin Decl. ¶ 21 (peer reviewer of several chapters in the Monograph who believes it provides "clear results demonstrating that sage-grouse respond to and are affected by habitat characteristics at large spatial scales").  FWS's March 2010 conclusion that the sage-grouse warranted ESA protection as a threatened or endangered species was based on the Monograph.

After reviewing the declarations submitted by ONDA and the BLM, along with the Monograph, the DNA, a letter from Christian A. Hagen, Ph.D., the ODFW's Sage Grouse Conservation Coordinator and the author of the ODFW Strategy, and a memorandum prepared by BLM Wildlife Biologist Matthew Obradovich, I find no error with the BLM's conclusion that the Monograph did not present significant new information.  I come to this conclusion for several reasons.

a.    Consistency with the ODFW Strategy

I find it important that Dr. Hagen and the ODFW support the BLM's approach and that the Juniper Treatment Project is consistent with the ODFW Strategy.  ODFW (with sage-grouse management responsibility in the state) commented in 2011 that:

> Greater sage-grouse . . . requirements were specifically addressed in the development of the EIS.  The BLM incorporated several project design elements to reduce or eliminate impacts to sage-grouse during implementation of the project including seasonal timing restrictions, buffers around breeding areas, and restrictions on treatment of adjacent areas.  The Department considers the North Steens Ecosystem Restoration Project to be consistent with the Department's Greater Sage-Grouse Conservation Strategy and *encourages the use of juniper treatment to improve sage-grouse habitat*.  While the project may result in some

short term impacts to sage-grouse, they will benefit greatly from increased
available habitat and habitat function over the long term.

NS-IMP 327 (emphasis added).[5]

Consistency with the ODFW Strategy is important and relevant. The ODFW Strategy
comments that "[t]he current status of sagebrush habitat is a landscape comprised of 70%
sagebrush and 30% potential habitat that has supported sage-grouse populations over the last 30
years." The ODFW Strategy suggests that short-term effects on habitat are acceptable if a 70/30
habitat mix is attained or retained over time because sage-grouse populations will remain stable
even with a loss of habitat in the short-term. SAR 87-88. Further, targeting the Steens Mountain
area, the ODFW Strategy noted the need to remove juniper in order to "maintain[] or enhance[]
the abundance and distribution of sage-grouse[.]" SAR 50.

The Juniper Treatment Project tailors treatments to the degree of juniper
intrusion–broadcast burning only denser juniper stands and, where sagebrush is present, using
only cutting, jackpot burning, and individual tree burning to limit effects on sage-grouse. Indeed,
Dr. Hagen explains that "[t]o the extent prescribed fire is used to eliminate Phase II and III
juniper stands it is consistent with sage-grouse conservation, as those habitats are no longer
suitable for sage-grouse nesting or wintering." NS-IMP 326.[6] Further, BLM will pace

---

[5]ONDA asserts FWS is charged with protection of the sage-grouse, but I note even FWS
(on another project) encourages conformance with the ODFW Strategy. ONDA Ex. 4 [48].

[6]ONDA cries foul because the words "Phase II" and "Phase III" juniper do not appear in
the EIS. However, the BLM uses the terms "early, mid and late-successional juniper sites,"
which are equivalent to the "Phases" used by ODFW to describe juniper stages. BLM's Reply
12. Similarly, contrary to ONDA's assertion, the EIS and ROD mention the 70/30 ratio, which
was provided for in both the 2005 and 2011 Strategies. See AR 382, 390 (requires conformance
with State and National sage-grouse strategies), 713, 715, 718, 616, AR 390, NS-IMP 1222.

treatments to consider areas recently treated as well as areas sufficiently revegetating to conform to the ODFW Strategy.  AR 377, 382, 390, 713, 718; NS-IMP 1222.

The EIS does recognize that the Juniper Treatment Project may result in a reduction of sage-grouse habitat for perhaps 15 years, which may in turn also affect success of nesting. AR 712 (nesting success "would likely decrease" with reduction in sagebrush cover).  The BLM also discusses the effect of burning over 1200 square miles–including the entire area used by the sage-grouse population.  NS-IMP 1226-1230 (citing relevant EIS pages).  The alternative, however, would be juniper intrusion into winter, breeding, nesting, brood-rearing, and migratory habitat.  AR 710.  The BLM concluded that leaving juniper encroachment and poor habitat will not help sage-grouse; 5% conifer cover will cause sage-grouse to avoid the area.  NS-IMP 1230. The BLM is, therefore, implementing the ODFW Strategy which calls for actions that "improve conditions of existing sagebrush (e.g., understory enhancement, fire break development) and enhance or restore potential habitats (e.g. juniper removal, invasive weed eradication)."  SAR 88.

b.    Effect of Fire on Sage-Grouse

One of the main points of disagreement between ONDA and the BLM is whether the BLM adequately assessed the effect of fire on sage-grouse based on a chapter in the Monograph prepared by Steven T. Knick and Steven E. Hanser.  Quoting from the Knick and Hanser chapter, Dr. Dobkin reports that increased fire "within 33.5 miles of a lek [raises] the probability of lek abandonment . . . by an astounding 800%."  Dobkin Decl. ¶ 24.  However, Dr. Hagen subsequently corresponded with Dr. Knick and learned that the 800% increased probability is weighted by factors other than fire and is based on burning 100% of the land within a 33.5 mile radius of a lek (i.e. 2.2 million acres burned).  NS-IMP 328, 292-93.  The Knick and Hanser

study actually estimates a 3.8% decrease in the probability of lek persistence for every 22,000

acres burned within a 33.5 mile radius of the lek, and an 8% decrease in the probability of lek

persistence when combined with other human activities such as road-building.  NS-IMP 293,

328.  Nevertheless, despite this lower probability of lek abandonment, it is true as ONDA points

out that Dr. Knick believes, "[F]ire is a very significant factor.  Along with human features and

relative lek size and isolation, it is a major determinant of lek persistence.  The conclusion that

even relatively small amounts of fire (say 10% of the area) having a major influence is

important."  ONDA's Resp. and Reply Ex. 2, at 1-2.

    The BLM, however, has persuasively explained that the Knick and Hanser study does not

present "significant" new information.  For example, although Knick believes fire is a

meaningful determinant of lek persistance, he also opines that a factor to consider is whether "the

proposed fire [is] in areas not currently used by sage-grouse.  If so, then fire cannot have much

effect."  Id.  One of the specific purposes of the Juniper Treatment Project is to restore sage-

grouse habitat, AR 363, 553, and as such, it proposes broadcast burning of denser juniper stands

that provide little to no habitat for sage-grouse.  AR 712 (partial treatment alternative), 716

(analysis incorporated into full treatment alternative).  Where juniper is scattered among

sagebrush, the BLM will choose different treatment methods such as cutting, jackpot burning and

individual tree burning, leaving sage-grouse habitat mostly unaffected.  AR 712, 606.  Moreover,

the human footprint to which Knick and Hanser refer is drastically different from what is

occurring in the area affected by the Juniper Treatment Project; urbanization, roads, power lines,

agriculture and energy development is simply not in the same sphere as the short-term use of

routes to implement the proposed treatments.  NS-IMP 1255 (also explaining "cumulative effect

of human activities may have a greater influence on persistence of sage-grouse populations than single land uses"). In short, the BLM examined the cumulative effects of fire on sage-grouse habitat in the EIS, found juniper to be interfering with habitat connectivity and concluded it could manage the project to avoid negative impacts to sage-grouse.

Further, the BLM relied on its own research and experience demonstrating that fire has not affected lek persistence on Steens Mountain; Dr. Knick admits his results did not involve a "tight data set" and had "much scatter in the data." ONDA's Resp. and Reply Ex. 2, at 1, 3. Indeed, 23% of the Burns District public lands have burned since 1980, but during the same point in time, sage-grouse populations have been stable.[7] The ODFW Strategy, too, evaluates the Knick and Hanser figure and concludes that their "findings are contrary to the current mosaic of habitat disturbance and population persistence of sage-grouse in Oregon." SAR 87.

Additionally, I do not accept ONDA's blanket assertion that an 8% increase in the probability of lek abandonment (or even a 3.8% increase) is analogous to evidence showing a 4% to 7% rate of decline in a species; the latter was considered to be "significant new information" for an ESA-listed species, requiring a supplemental EIS. Or. Natural Res. Council Action v. U.S. Forest Serv., 445 F. Supp. 2d 1211, 1226 (D. Or. 2006). An increase in lek abandonment is simply not akin to a population decline and this factor does not persuade me that the BLM erred

---

[7]ONDA questions the BLM's assertion that the sage-grouse population has been stable. Although it noted wide fluctuations in male numbers, SAR 38, the ODFW Strategy found "[s]tatewide spring population trends were relatively stable for the assessment period (1980-2010) with population increases in most areas from the mid 1990s through 2006." SAR 45. ODFW also notes a stable population for the Steens area. SAR 208. Additionally, ONDA criticizes the BLM for relying on unpublished lek counts, but the lek counts are from 2011, and the BLM attaches them to its Response and Reply as Exhibit 1.

in finding the Monograph did not present significant new information requiring it to undertake a supplemental EIS.

c. <u>Conclusion on Significance of Monograph</u>

In sum, nothing in the Monograph alters the results of the BLM's original environmental analysis.  To the extent ONDA wants me to accept Dr. Dobkin's interpretation of the Monograph over Dr. Hagen's or the BLM's, I decline to do so.  "Though a party may cite studies that support a conclusion different from the one the [agency] reached, it is not our role to weigh competing scientific analyses."  <u>Ecology Ctr.</u>, 574 F.3d at 659.  Further, although it is not persuasive on its own, I find it meaningful that ODFW, the agency which is responsible for sage-grouse management in Oregon, approves of the Juniper Treatment Project and the environmental analysis performed by the BLM.  <u>Northwest Envtl. Advocates v. Nat'l Marine Fisheries Serv.</u>, 460 F.3d 1125, 1139 (9th Cir. 2006) ("While not dispositive, we have found it 'significant' when other governmental agencies responsible for environmental protection have sanctioned a particular project's environmental analyses.").  The BLM's DNA was not arbitrary and capricious in its treatment of the Monograph.

2. <u>FWS's "Warranted" Decision on Sage-grouse</u>

ONDA argues that the BLM failed to take the requisite "hard look" in assessing the significance of FWS's determination that sage-grouse warranted protection as a threatened or endangered species under the ESA.  FWS changed its opinion about the status of the species after the "numerous scientific papers and reports with new and highly relevant information" were published, even though populations appear stable.  Listing, 75 Fed. Reg. at 13,987-88.  Additionally, ONDA highlights FWS's statements that the benefits of juniper treatments on sage-

grouse are inconclusive, and its remark that only 55.7% of all treatments are even considered

"effective." Id. at 13,928.  FWS also relied on a 2009 study reporting that "nesting habitat loss

from fire[] creat[es] a long-term negative impact that will require 25 to 150 years of sagebrush

regrowth before sufficient canopy cover becomes available for nesting birds." Id. at 13,931.

    As an initial matter, the BLM treated the sage-grouse in its EIS as a sensitive status

species.  FWS's listing determination changes only the "legal status of the [species], but it did

not change the biological status."  Swanson v. U.S. Forest Serv., 87 F.3d 339, 344 (9th Cir. 1996)

(NMFS's listing of salmon as threatened did not require a supplemental EIS).  Nothing else in the

listing determination constitutes new information requiring the preparation of a supplemental

EIS.  The BLM relied on other FWS's findings:  that "pinyon-juniper encroachment into

occupied sage-grouse habitat reduces, and likely eventually eliminates, sage-grouse occupancy in

these areas[,]" that "we infer some level of positive response" from juniper treatments and, that

the treatments "have the potential to provide an immediate benefit to sage-grouse."  Listing, 75

Fed. Reg. at 13,938-39.

    Dr. Dobkin believes that, "to minimize adverse impacts on sage-grouse nesting, brood-

rearing, and lek persistence (and to minimize cheatgrass expansion), the BLM should not employ

broadcast burning, jackpot burning, or pile burning."  Second Dobkin Decl. ¶ 11.  However, the

BLM focused on FWS's opinion that "treatments are not likely keeping pace with the current rate

of pinyon-juniper encroachment, at least in parts of the range."  Listing, 75 Fed. Reg. at 13,939.

After reviewing Oregon's current pace of juniper treatments, FWS estimated that it "would take

approximately 60 years to remove the threat of juniper encroachment within 3 miles of sage-

grouse leks in Oregon, assuming expansion does not continue."  Id.  The BLM notes that the EIS

Page 21 - OPINION AND ORDER

included information on known leks, typical nesting habitat, brood rearing habitat, and the

relationship of nesting sites to lek sites.  AR 650-51.  It analyzed the effects of juniper expansion

on habitat and the problem with not treating juniper, including loss of winter, breeding, nesting,

early to late brood-rearing, and migratory habitat, as well as the effects of various kinds of

juniper treatments on these habitats.  AR 651, 710.  It is important, too, that the ODFW Strategy

incorporated the 12-month finding, IMP 1270, making the Juniper Treatment Project's

consistency with the ODFW Strategy all that more compelling.  As set forth above, ONDA's

concern that the BLM has not adequately considered short-term impacts on sage-grouse should

be resolved by the BLM's reliance on the ODFW Strategy, which concludes short-term impacts

on habitat are acceptable if a 70/30 habitat mix is attained or retained over time.  SAR 87-88.

     Accordingly, the BLM's view that FWS's findings did not trigger the BLM's duty to

perform additional analysis was not arbitrary or capricious.

        3.    <u>Two-Mile Lek Buffer</u>

     ONDA asserts that the BLM was aware of new information before issuing its EIS

suggesting sage-grouse are affected by habitat disturbance at greater distances than known

before.  For example, the BLM was warned that its science might be outdated when it chose a

two-mile buffer around leks–one of the PDEs or mitigation measures–permitting juniper

treatments including broadcast burning outside that buffer.   In 2005, ODFW warned BLM that

"most sage-grouse nests are located within four miles of leks in areas of big sagebrush cover.

This cover is necessary to conceal their nests from predators and improve nesting success."  AR

3519.  In 2006, BLM's wildlife biologist questioned the two-mile buffer, reporting that "a little

more than half of the nesting female sage-grouse nest within four miles of a lek," and most

females "traveled quite a distance from the lek."  AR 959.  ONDA characterizes the two-mile

buffer choice as arbitrary; the EIS did not consider the effects of fire in setting the buffer, and the

BLM did not evaluate whether a larger buffer within which trees would be burned individually to

avoid lek abandonment would be more appropriate.  ONDA also questions the BLM's ability to

use nesting locations to implement treatment decisions when the BLM has not mapped the nests.

ONDA suggests if the agency has the nesting locations, this too would constitute significant

circumstances warranting a supplemental EIS.

The BLM extensively evaluated the size of the buffer and landed on two miles as the only

logical choice.  The BLM explained:

> Two-mile lek buffers were used as the 4-mile lek buffers would occupy almost
> half the Project Area eliminating some strategies proposed for effective treatment
> of juniper.  Some females, up to half those tracked in studies, may range greater
> than 4 miles from a lek to find suitable nesting habitat.  The study on Steens
> Mountain involved very few females (29) over several years and distance from
> nest site to nearest lek was not determined in the report.  The average distance
> reported was from the lek where the female was captured to the nest site.  While
> some females nested within 4 miles of a lek, it is possible many nesting areas
> within 4 miles of each lek site are already occupied by juniper.  This probably also
> occurs within the 2-mile buffer as well.  To treat juniper as aggressively as
> suggested by broadcast burning within the 2-mile lek buffer would destroy most
> big sagebrush and a majority of the available and preferred nest sites.  By treating
> juniper within the 2-mile lek buffer by cutting alone or cutting and jackpot
> burning, big sagebrush will return to treated sites quicker than with broadcast
> burning and open up more sites for nesting.  In the area between the 2-mile buffer
> and the 4-mile buffer, half or more the existing suitable nesting habitat (no juniper
> encroachment to early transitional) would be retained while mid- to late
> transitional juniper areas would be treated more aggressively.  This should
> provide a mosaic of burned/unburned areas in big sagebrush.

AR 792.  Further, even outside the buffer, the BLM explained that the project paces management

of sagebrush cover by considering both areas recently treated as well as areas sufficiently

revegetating to attain the 70/30 mix in the ODFW Strategy.  AR 382, 792.  The BLM's

explanation evidences an awareness of the emerging science and the risks posed by adopting a

two-mile buffer, as well as the need to limit treatments within "currently suitable habitat to

maintain an intact sagebrush component."  NS-IMP 1270.  As for whether nesting locations

constitutes significant information triggering a supplemental EIS, ONDA fails to explain how

this information would alter the results of the BLM's analysis.  The BLM has already placed a

buffer around leks, the place where most nesting takes place.  Additionally, it has committed to

ceasing all treatments in those areas during the nesting season.  The BLM has taken the necessary

"hard look" required by NEPA by examining and disclosing the possible effects on sage-grouse.

        4.     <u>Wind Project</u>

     According to ONDA, a proposal to develop an industrial-scale wind energy generation

and transmission facility–the Greater Echanis wind project–is in the works within the project

area; ONDA contends the BLM neglected to consider it in the EIS and should have issued a

supplemental EIS addressing it.  At the outset, I must resolve disputes between the parties about

whether the wind project was sufficiently concrete so as to require BLM's consideration of it in

the 2007 ROD for the Juniper Treatment Project, as well as what the actual size of the wind

project is to determine whether BLM arbitrarily and capriciously concluded it did not constitute

significant new information.

     According to the record, the relevant events occurred as follows:  in April 2007, Harney

County approved a permit for a private developer to install the single Echanis Project made up of

40 to 69 wind turbine generators, each 415 feet tall, on private land outside the CMPA but within

a portion of the proposed Juniper Treatment Project area.  Five months later, the BLM issued the

Juniper Treatment Project EIS and ROD.  Neither the Juniper Treatment Project EIS nor the

ROD mention this wind project.  The private developer subsequently filed a powerline

application with the BLM in December 2008, proposing a transmission line on 90-foot tall

towers across nine miles of public lands.  In July 2008, the same Echanis developer submitted a

permit application to Harney County for the West Ridge Project, to construct an additional 40 to

69 wind turbines within the Juniper Treatment Project area and within 1,500 feet of three leks,

but withdrew the application in January 2009.  Similarly, it submitted a permit application to

Harney County for the East Ridge Project, for another 40 to 69 wind turbines within the Juniper

Treatment Project area, but it withdrew this application, too.  Collectively, the Echanis, East and

West Ridge sites, along with a fourth site on Riddle Mountain 20 miles to the north of Steens

Mountain, are referred to as the Greater Echanis wind development project.

   In July 2010, the BLM issued a draft EIS on the transmission lines required for the single

Echanis Project, treating the East and West Ridge turbines as "reasonably foreseeable future

actions" even though the developer had withdrawn both applications.  NS-IMP 925.  The BLM

noted in the draft EIS, called the North Steens 230-kV Transmission Line Project, that

"development of the Echanis Project is dependent upon Federal approval of the [right of way]

grant for the transmission line" as it would connect the Echanis Project to the existing grid.  NS-

IMP 337.  Further, the BLM reported that "Phase I" of transmission line development would be

the construction of a 230-k V transmission line, even though it would "only initially be energized

and operated at 115-k V for the [single] Echanis Project."  NS-IMP 338.  Phase II would require

stringing three more conductors on previously erected poles to transmit power from either or both

the East and West Ridge sites.  It is unclear from the draft EIS, but it appears no further NEPA

review will be required in order to connect the East and West Ridge sites to the transmission line.

The East and West Ridge sites are located on private land, although within the Juniper Treatment

Project area.

ONDA argues the BLM should have discussed the Echanis application in the Juniper

Treatment Project EIS, since the County approved the permit prior to the BLM's issuance of the

NEPA documentation.  The BLM's NEPA regulations define "[r]easonably foreseeable future

actions" as those

> federal and non-federal activities not yet undertaken, but sufficiently likely to
> occur, that a Responsible Official of ordinary prudence would take such activities
> into account in reaching a decision.  These federal and non-federal activities that
> must be taken into account in the analysis of cumulative impact include, but are
> not limited to, activities for which there are existing decisions, funding, or
> proposals identified by the bureau.  Reasonably foreseeable future actions do not
> include those actions that are highly speculative or indefinite.

43 C.F.R. § 46.30.

The BLM's contention–that because the North Steens 230-kV Transmission Line Project

draft EIS has assessed the cumulative effects of the Juniper Treatment Project, the agency has

complied with its NEPA obligation–is not supported by the law.  The agency may only rely on a

cumulative effects analysis it completed earlier to satisfy its NEPA responsibilities on a later

project; here the BLM is attempting to rely on the later cumulative effects analysis in the

Transmission Line Project draft EIS to satisfy its NEPA obligations with respect to the earlier

Juniper Treatment Project.  See Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800,

811 (9th Cir. 1999) ("The appellees also attempt to tier the Exchange EIS to the Green River

Watershed Report to cure the deficiencies of the cumulative impact analysis of the Exchange

EIS.  Such reliance is impermissible under the NEPA regulations, which only permit tiering to

prior EIS's.  40 C.F.R. §§ 1502.20 and 1508.28.").

Page 26 - OPINION AND ORDER

Further, given that Echanis planned for turbines in the Juniper Treatment Project area before the BLM's issuance of the Juniper Treatment Project EIS, and that Echanis could not proceed without transmission lines connecting the turbines to the existing grid, I can see merit in ONDA's argument that the BLM should have included a discussion of it in the Juniper Treatment Project EIS. Nevertheless, although it is a close call, I defer to the BLM's assertion that Echanis as approved by Harney County was speculative and the effects on the Juniper Treatment Project area were not sufficiently apparent to require discussion of it in the EIS and ROD; the transmission route had not yet been determined. NS-IMP 1272; Envtl. Prot. Info. Ctr. v. U.S. Forest Serv., 451 F.3d 1005, 1014 (9th Cir. 2006) ("[A]lthough it is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now, if not enough information is available to give meaningful consideration now, an agency decision may not be invalidated based on the failure to discuss an inchoate, yet contemplated, project.")

The next question is whether the wind project is "significant" such that the BLM was required to conduct supplemental environmental analysis.[8] The BLM concluded that, at least with respect to the single Echanis Project approved by Harney County, the environmental effects would not be significant enough to require the completion of a supplemental EIS for the Juniper Treatment Project. ONDA assumes prescribed broadcast burning will take place in the area of the wind project, but the BLM has disabused it of that belief. Additionally, the BLM reports that

---

[8]ONDA suggests the BLM does not dispute the significance of the information, but BLM argues in its memorandum supporting its cross-motion for summary judgment that the wind project does not create a "'seriously different picture' of the environmental effects of the North Steens Ecosystem Restoration Project." BLM's Mem. in Supp. of Cross-Mot. for Summ. J. 24.

no leks are located within three miles of the Echanis site.  The BLM concedes that the proposed

transmission line is within two miles of a lek, but notes the transmission line and leks are

separated by two drainages.  The proposed route is also not within nesting habitat.  The Echanis

proposal and powerline proposal constitute 112 acres, about .05% of the area to be treated under

the Juniper Project.  Finally, as the DNA notes, the BLM's adaptive management approach

ensures that "suitable habitat remains throughout the duration of the Project while treated areas

recover."  NS-IMP 1273.  The BLM's conclusion that the Echanis Project would not significantly

impact the environment in a way not previously considered, and that a supplemental EIS is not

required, was not arbitrary and capricious.

      However, if the East and West Ridge sites are considered together with the Echanis and

transmission line portion of the Project, the area could see a total of 207 wind turbines.  The

West Ridge site would place turbines 1,500 feet from leks near Moon Hill, and that same area is

planned for juniper treatments this year.  In drafting the DNA here, the BLM did not assess

whether the East and West Ridge sites could constitute "significant" new information triggering a

supplemental EIS because it did not believe the East and West Ridge sites were "reasonably

foreseeable"; the developer had withdrawn its applications.  The draft EIS for the transmission

project, however, considers the East and West Ridge sites "reasonably foreseeable future actions"

despite the fact that the developer had withdrawn its applications for those projects at the time

the BLM completed that draft EIS.  NS-IMP 925.

      Having considered the East and West Ridge Project sites "reasonably foreseeable" for

purposes of evaluating the transmission line, when the developer had already pulled the

applications for those projects at the time of the draft EIS on the transmission line, the BLM fails

to provide a rational explanation in the DNA for why these projects are not reasonably foreseeable requiring a determination as to their significance in the context of the Juniper Treatment Project.[9]  The developer submitted a transmission line application for a 230-k V transmission line, even though it would "only initially be energized and operated at 115-k V for the Echanis Project," leaving open the option of connecting the line to the East and West Ridge turbines.  As a result, it was arbitrary and capricious for the BLM not to evaluate in the DNA whether the two potential sites constituted significant information that may require a supplemental EIS.

C.    Whether There are Substantial Changes to the Project

ONDA challenges the BLM's decision in June 2010 to broadcast burn directly atop one sage-grouse lek and as close to 500 to 1,500 feet from three others.  According to ONDA, this "Moon Hill" juniper treatment is, thus, directly contradictory to the EIS and ROD providing no broadcast burning within two miles of sage-grouse leks, and that the BLM has made "substantial changes" to the proposed action.  40 C.F.R. § 1502.9(c)(1)(i).

The BLM responds that the maps for the Moon Hill Project were drafts and it had not yet superimposed all PDEs (including the two-mile buffer) on them.  NS-IMP 1262.  The BLM asserts that "[f]inal broadcast burn units will include the Greater Sage-Grouse Lek PDE and

_____

[9]Indeed, in a Notice of Further Administrative Development [92], ONDA alerts the Court that the Final Environmental Impact Statement for the North Steens Transmission Line Project continues to refer to the East and West Ridge turbines as "reasonably foreseeable."  The BLM asserts the transmission line project "goes beyond the requirements of NEPA" by considering the East and West Ridge sites, but does not speak to the fact that the transmission line is designed to carry power from more than the single Echanis site.  BLM's Resp. to Pl.'s Nov. 2, 2011 Not. 2. As a result, I question BLM's explanation for treating the same proposals as reasonably foreseeable in one environmental analysis but not in another.

broadcast burning will not occur within the 2-mile buffers[.]"  BLM's Mem. in Supp. of Cross-

Mot. for Summ. J. 23.  Nothing contradicts the BLM's assertion that the maps are drafts and I

accept the BLM's assertion that it will comply with the two-mile lek buffers.

Additionally, after oral argument on the cross-motions for summary judgment, ONDA

filed a Motion to Supplement the Administrative Record which the BLM did not oppose.  The

BLM supplemented the record with two maps the import of which are in dispute.  ONDA asserts

the maps show the BLM is cutting and piling juniper and burning it within two miles of a sage-

grouse lek, which it believes the ROD and EIS prohibits.  ONDA urges me to conclude that the

BLM's decision to pile and burn juniper is a significant change to the action the BLM adopted in

the ROD.

The BLM responds that the ROD prohibits only broadcast burning within two miles of

sage-grouse leks.  Otherwise, the ROD imposes a PDE that "[t]reatment methods will be limited

to cutting and individually burning juniper within the buffer area," that all treatments are

precluded from March 1 to June 15 to account for the mating and nesting seasons, and that

"[i]nvasive juniper will be treated aggressively" in the buffers.  AR 390.  The BLM then

references language in a Memorandum prepared by a BLM Wildlife Biologist on June 16, 2011,

in the midst of this litigation, interpreting the PDE to mean, "Juniper trees within the lek buffer

would be cut and jackpot burned or cut and piled, with only the piles burned to minimize loss of

sagebrush."  NS-IMP 1224.

ONDA's confusion is understandable.  The ROD and EIS carefully distinguish between

the two treatment methods of pile burning and individual tree burning.  AR 372 (definitions of

pile burning and single-tree burning).  Nevertheless, the PDEs explain that they are "subject to

change during the adaptive management process." AR 390, 598. Further, the BLM Burns

District's Lead Forester explains that:

> The BLM determined the best treatment method was to individually cut the
> juniper tree, cut the tree into smaller pieces, and then, by hand, place these pieces
> into a pile to burn. This is based on experience from other projects with cutting
> and individually burning dense juniper stands and experimentation within the
> Wildlands Juniper Management Area. BLM has found in dense juniper areas that
> cutting the tree up and then putting these pieces in a pile retains the most existing
> shrub, grass, and forb cover by decreasing the overall burned area. It also
> removes the tree skeleton, so it reduces raptor perches in restored sage-grouse
> habitat. These hand piles typically consist of one or less trees cut up and piled. In
> other words, one tree may have enough volume to make up two piles. The piles
> can be no larger than 6'x8'x7' tall and no smaller than 6'x6'x5' tall. Piles would be
> burned after drying and under cold ground conditions. There are no fire breaks
> necessary to burn these cut-up tree pieces and no motorized access off-road is
> necessary. Cutters walk to individual trees. The [ROD] provides for BLM to
> aggressively treat juniper within 2-mile lek buffers and provides for cutting and
> individually burning the juniper within the buffer area. BLM is cutting and then
> individually burning the trees by cutting them into small pieces and stacking these
> pieces rather than leaving the tree in one place over a relatively larger area for the
> burning.

Decl. of Jon Reponen ¶ 3.

The BLM interpreted the PDE to allow some adjustment and to permit cutting and

burning piles of individually cut trees and I can find no fault with its interpretation. The PDE by

no means "prohibit[s] pile burning of juniper within two miles of sage-grouse leks," contrary to

ONDA's assertion. ONDA Mem. in Supp. of Mot. to Supp. Administrative Record 3.[10] Further,

---

[10]Indeed, Map 2.3 in the EIS demonstrating the treatments within a two-mile lek buffer
suggest cutting and "jackpot burn[ing]" within the buffer. AR 617. "Jackpot Burning" is defined
in the glossary to mean "Accumulations of fuels are burned while other vegetation remains
unburned. This method would be implemented in the late fall, winter, or early spring when the
potential for fire spread is low. Fuels could be piled by hand or machine." AR 771. Similarly,
in responding to public concerns about the two-mile lek buffer, the BLM responds that there are
benefits to "cutting alone or cutting and jackpot burning" within the two-mile lek buffer. AR
792.

the EIS notes no difference in effects on sage-grouse between individual tree burning versus cut and pile burning or jackpot burning individual trees, and I could find none in ONDA's submissions. I do not find any substantial changes in the Juniper Treatment Project warranting supplemental environmental analysis.

        D.       <u>Annual Juniper Treatments</u>

The ROD and EIS do not specify timelines or locations for juniper treatments, identify the specific methods to be used in each location, or the PDEs to be used in each location. Instead, the ROD divides the 336,000-acre project area into approximately 50 project units and explains that the BLM will decide where, when, and how to implement treatments each year. AR 402, 413 (map depicting the units), 553 (extent and types of treatment varying by year), and 563 ("techniques used would depend on site-specific plan community objectives and project constraints"). The Field Manager makes the determination as to which PDEs to use on each treatment. AR 402, 601. Off-road vehicle use, maintenance of roads, and post-treatment livestock rest are also left to annual, project-specific decision. AR 392 (roads "may be" fixed in a variety of ways), 372 (post-treatment grazing rest determined by the Field Manager, but with parameters about the number of seasons of rest before and after treatment). ONDA challenges this approach.

        1.       <u>Whether Annual Treatment Decisions Require NEPA Review</u>

Since the IBLA's affirmation of the BLM's decision, the BLM has issued task orders and contracts to proceed with juniper treatments. One such contract provides for "indefinite delivery, indefinite quantity" juniper cutting, providing "maps" depicting different treatments. NS-IMP 38, 54, 58, 90-117, 242-50. Since then, the BLM has issued at least five notices to proceed to the

contractor (up until the voluntary cessation of activity when faced with ONDA's motion for a temporary restraining order), specifying which of the five methods of treatment the contractor should use.  The BLM does not reference sage-grouse in these documents.  ONDA argues each of these actions is a "final agency action" subject to challenge.  Since the EIS does not provide design details for any treatment unit, ONDA suggests, the BLM's site-specific juniper treatment decisions represent its "last word"–without them the cutting and burning cannot occur.  NS-IMP 162, 172; Boody, 468 F.3d at 561 (annual review decisions about a special status species were final agency actions separate from original decision).  According to ONDA, the BLM violated NEPA because it did not prepare environmental analyses for each treatment during the past three years.

The sufficiency of the environmental analysis made on a landscape level, as opposed to project by project, is a separate question I address next.  In terms of whether each implementation of the ROD is a separate action requiring environmental review, I conclude that BLM is merely implementing the EIS and ROD and that these decisions have been analyzed in the EIS.  The EIS evaluates the methods of treatment, annual acreage targets, and effects of the treatment on the environment by habitat type and by each Steens Mountain resource (e.g. air, soils, water, forests, weeds, etc.).  It describes specific burning methods and when each will be used.  It imposes PDEs to guide BLM decisions about when, where and which of the treatment methods are appropriate.  Further, the case on which ONDA relies involved an agency which did not implement, but amended, an earlier analysis.  Boody, 468 F.3d at 558 ("even if adaptive management modifications were contemplated by the 2000 FSEIS, there must be limits to how

dramatic 'modifications' can be before they are deemed 'amendments'"").  As a result, I find that

case to be inapposite.  The BLM did not err.

2.    <u>Segmentation of Connected Actions</u>

ONDA argues that by failing to undertake environmental analysis on each of the site-

specific projects, the BLM has improperly segmented connected actions in violation of NEPA.

NEPA requires a review of all direct, indirect, and cumulative impacts of a proposed action,

including impacts caused by connected actions.  40 C.F.R. §§ 1508.7, 1508.8, 1508.25.  A

connected action is one that is "closely related and therefore should be discussed in the same

impact statement."  <u>Id.</u> at §§ 1508.25(a)(1), 1502.4(a).  Actions are connected if they "[a]re

interdependent parts of a larger action and depend on the larger action for their justification."  <u>Id.</u>

at § 1508.25(a)(1)(iii).  ONDA contends that these site-specific decisions needed to be analyzed

within a single EIS.

ONDA essentially challenges the notion of adaptive management, quoting commentators

describing the process as a "NEPA 'shell game,' where analysis of certain issues is deferred in

the EIS–but the agency later declines to prepare a supplemental NEPA analysis and alleges that

those same issues *were* addressed in the original EIS."  Michael Freeman & Meg Parish,

<u>Supplementation of NEPA Analyses: Triggers and Requirement</u>, 2010 No. 4 RMMLF-INST

PAPER No. 6 (Oct. 28-29, 2010).  ONDA suggests what the BLM has done is similar to the 10-

year timber management plans that did "not designate specific timber sale boundaries or require

that any particular stand of timber be harvested."  <u>Portland Audubon Soc. v. Lujan</u>, 795 F. Supp.

1489, 1491 (D. Or. 1992), <u>aff'd</u>, 928 F.2d 705 (9th Cir. 1993).  When spotted owl habitat needs

became known, the court ordered BLM to analyze the new information for each timber sale in a

NEPA document.  Indeed, NEPA regulations require "environmental effects of any adaptive

management strategy must be evaluated in [an EIS] or subsequent NEPA analysis."  43 C.F.R.

§ 46.145.

The BLM has not improperly segmented connected actions; instead, it prepared a

landscape-level EIS analyzing the effects of the Juniper Treatment Project on all the resources of

the area, including air, soils, water, wetlands, riparian areas, water quality, soil crusts, forests,

weeds, vegetation, fish, birds, wildlife, special status species (including sage-grouse), visual

resources, and wilderness.  The BLM considered its need to comply with The Steens Act, which

requires managing juniper on a landscape level, as well as the cost of proceeding on a project by

project basis, produced a full cumulative effects analysis, and committed to implementing

adaptive management.

Additionally, with a project this size, adaptive management is the only logical way the

BLM can proceed to undertake habitat restoration, providing the agency with the flexibility to

respond to on-the-ground circumstances when they arise.  Courts have approved the use of

adaptive management.  See Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497,

517 (D.C. Cir. 2010) ("The procedural requirements of NEPA do not force agencies to make

detailed, unchangeable mitigation plans for long-term development projects . . . . Allowing

adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of

environmental impacts, not a violation of NEPA."); ONRC v. U.S. Forest Serv., 59 F. Supp. 2d

1085, 1096 (W.D. Wash. 1999) (adaptive management "adequate to deal with any new

information" because agencies have "the flexibility to reduce or halt logging"); W. Watersheds

Project v. Salazar, 766 F. Supp. 2d 1095, 1110-1112 (D. Mont. 2011) (describing adaptive

management as "unremarkable notion that resource managers should evaluate the results of their

efforts and adjust"). Further, ONDA has not identified any effects from the projects already

undertaken by the BLM that necessitate a subsequent NEPA analysis. See In re Operation of the

Mo. River Sys. Litig., 363 F. Supp. 2d 1145, 1163-64 (D. Minn. 2004), aff'd in part, vacated in

part, 421 F.3d 618 (8th Cir. 2005) ("[A]bsent evidence that the adaptive management process

actually results in the Corps' evasion of NEPA obligations, the Court declines to declare this

approach invalid.").

Further, the final EIS at issue here is not the kind of programmatic EIS that requires the

preparation of further environmental analysis in order to implement the project. Ass'n of Pub.

Agency Customers v. Bonneville Power Admin., 126 F.3d 1158, 1184 (9th Cir. 1997) (upheld

EIS that evaluated multiple future power sales contracts in a single document). I do not think

that Portland Audubon, cited by ONDA, changes the outcome. In that case, the court found the

BLM failed to address the effect of a decline in spotted owls on the survivability of the species, a

fact constituting "new information" and triggering the need for further environmental analysis.

795 F. Supp. at 1492. I have not found a similar circumstance exists here.

The BLM's decision to approach the Juniper Treatment Project in the way it did was not

a violation of NEPA.

E.    Conclusion

The BLM's decision in the DNA not to supplement the EIS based on the sage-grouse

publications was not arbitrary and capricious. Additionally, the BLM's implementation of the

EIS and ROD was not a violation of NEPA, and it has not made substantial changes to the

Juniper Treatment Project requiring further NEPA analysis.

Page 36 - OPINION AND ORDER

However, the BLM's conclusion that the East and West Ridge projects were not "reasonably foreseeable" and, thus, did not require an assessment of their significance, was arbitrary and capricious. The BLM must evaluate whether the project described in the North Steens 230-kV Transmission Line Project constitute significant new circumstances warranting a supplemental EIS on the Juniper Treatment Project.

II.    FLPMA

ONDA argues the proposed action contravenes the protections provided to lands designated as Wilderness Study Areas ("WSAs") under FLPMA. Pursuant to FLPMA, the BLM has identified areas that qualify as WSAs under the Wilderness Act. 43 U.S.C. § 1782(a). The BLM's task is to manage these WSAs "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). In other words, BLM must not jeopardize Congress's ability to find that a WSA has the necessary wilderness values for permanent designation as Wilderness in the future; this is known as the "non-impairment" requirement. The BLM has also adopted a land use plan, pursuant to FLPMA, and must manage the public lands in compliance with that plan. 43 U.S.C. § 1732(a).

A.    Implementation of the Non-Impairment Requirement

To implement the non-impairment requirement, BLM published the Interim Management Policy for Lands Under Wilderness Review or "IMP." SAR 3915.[11] The IMP generally permits in WSAs only activities that are temporary and that do not create a "surface disturbance." SAR 3922; 3927. Chapter I contains, among the "permitted exceptions," "(4) Uses and facilities that

_____

[11] The IMP is included in the Supplemental Administrative Record ("SAR"), but it also contains a separate "AR" label because it has been used in other proceedings. The parties and the Court cite the IMP using the SAR page number.

clearly protect or enhance the land's wilderness values or that are the minimum necessary for

public health and safety in the use and enjoyment of the wilderness values." SAR 3927. The

IMP, then, permits "[a]ctions that clearly benefit a WSA's wilderness values through activities

that restore, protect, or maintain these values[.]" SAR 3928.

Nevertheless, even if actions benefit wilderness values, the actions "must still be carried

out in a manner which is least disturbing to the site." Id. The IMP helpfully explains:

> In order to determine whether a proposed action enhances wilderness values
> within a given WSA, one must refer to the original wilderness inventory for
> baseline or benchmark data concerning the particular wilderness value(s) being
> affected . . . . If the proposed action would result in a positive or beneficial change
> in the state or condition of the wilderness value(s) as described, . . . then the
> wilderness value would be enhanced by the proposed action. Conversely, if the
> proposed action would result in a negative or detrimental change in the state or
> condition of the wilderness value(s) then that wilderness value would be degraded
> or impacted and the proposed action must not be allowed.

Id. For example, the IMP explains that drift fences around hot springs may be appropriate to

mitigate damage to riparian vegetation caused by domestic livestock or wild horses; "[a]ny

negative impacts to wilderness values created by this fence would be clearly offset by the

positive benefits of protecting in a more natural condition a special feature of the wilderness

resource." SAR 3929. The IMP sets out a multi-step process in evaluating any action proposed

in a WSA, and specifically directs,

> Chapter III of this handbook contains guidelines and special exceptions for many
> of the specific uses and facilities which may take place or be proposed in
> Wilderness Study Areas. Consult these guidelines for specific policy guidance
> covering the use or facility. If specific guidelines do not address the proposal
> being evaluated, refer to the 'nonimpairment criteria' from Chapter I and other
> applicable policies that may apply in this particular case.

SAR 3939.

Chapter III contains very limited exceptions for vegetation management and for using roads. One exception is for "[p]rescribed burning" which "may be used where necessary to maintain fire-dependent natural ecosystems." SAR 3956.

    B.    <u>Scope of Review</u>

As an initial matter, I must determine the extent to which the IMP is binding on the BLM. The BLM argues that the IMP is an internal guideline and does not impose any duties on it, citing <u>Thompson v. United States</u>, 592 F.2d 1104 (9th Cir. 1979) and <u>Western Radio Services Co., Inc. v. Espy</u>, 79 F.3d 896, 901 (9th Cir. 1996). The problem with this rationale is that the BLM has incorporated the IMP into its Steens Mountain Regional Management Plan. Having done so, the agency's actions must comply with the IMP. AR 3973 ("WSAs are managed in accordance with the BLM's WSA IMP"); 43 U.S.C. § 1732(a) ("Secretary shall manage public lands . . . in accordance with the land use plans"); <u>Ecology Ctr.</u>, 574 F.3d at 664 ("where an otherwise advisory document has been clearly incorporated into a Forest Plan or other binding document, its requirements become mandatory"). Indeed, the BLM itself concedes in the EIS that "[a]ny action proposed in a WSA needs to be compliant with the FLPMA and the WSA IMP." AR 753, 12 n.14 (IBLA decision that "BLM's specific management of the lands is governed by the IMP"). Accordingly, any failure of the BLM to comply with its own agency guidance could be considered arbitrary and capricious. See <u>Ecology Ctr. v. Austin</u>, 430 F.3d 1057, 1069-70 (9th Cir. 2005) (arbitrary and capricious to ignore a standard when final EIS discusses it as if it is

binding), <u>overruled on other grounds by</u> <u>The Lands Council v. McNair</u>, 537 F.3d 981, 990 (9th

Cir. 2008) (en banc).[12]

The next question, then, is whether the IBLA's interpretation of the IMP is entitled to

deference and, if so, what kind.  To be clear, I am not faced with a question of whether the IMP

is a proper interpretation of FLPMA, a statute.[13]  Rather, the parties ask me to evaluate whether

the IBLA's interpretation of the IMP is entitled to deference.  ONDA cites <u>Thomas Jefferson</u>

<u>University v. Shalala</u>, 512 U.S. 504, 512 (1994), and the BLM references <u>Auer v. Robbins</u>, 519

U.S. 452, 461 (1997), but the standards announced in those cases are identical:  I must give

"substantial deference to an agency's interpretation of its own regulations," and give the agency's

interpretation "controlling weight unless it is plainly erroneous or inconsistent with the

regulation."  <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512; <u>see also</u> <u>Auer</u>, 519 U.S. at 461.

 C. <u>Juniper Treatments</u>

  1. <u>Proposed Juniper Treatments in WSAs</u>

The BLM proposes to undertake juniper treatments in a very small portion of the Lower

Stonehouse WSA (less than 2% of the WSA), as well as the Blitzen River, Bridge Creek, Home

Creek, High Steens, and South Fork Donner und Blitzen WSAs.  These WSAs constitute a total

of 79,607 acres of the Project area.  The affected WSAs were identified by the BLM as

---

[12] As a result, I do not discuss the BLM's argument that because the IMP is not published in the Code of Federal Regulations, it is not a regulation with the force and effect of law.  <u>See</u> <u>River Runners for Wilderness v. Martin</u>, 593 F.3d 1064, 1071 (9th Cir. 2010) (two pronged analysis to determine force and effect of law:  did pronouncement "prescribe substantive rules" and did it "conform to procedural requirements" like publication).

[13] Consequently, I do not examine the BLM's argument that the IBLA's interpretation of the IMP is entitled to deference under <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 843-44 (1984).

candidates for wilderness for various reasons including: naturalness, which is enhanced in some

areas by vegetative screening offered by junipers; solitude, which is again partly due to

vegetative screening from juniper stands; primitive and unconfined recreation such as fishing,

hiking, backpacking, horseback riding, hunting and fishing opportunities; and special features,

which include various wildlife viewing opportunities such as sage-grouse strutting ground.

      The BLM proposes to utilize all treatment methods including: single tree burning;

jackpot burning (possibly necessitating cutting remaining stumps close to the ground and carving

the end to look less unnatural); pile burning (possibly requiring cutting and carving stumps); and

broadcast burning (cutting juniper trees before broadcast burning may require cutting and carving

stumps). The BLM also proposes what it calls "Fall and Leave (No Burning)," which would be

completed without off-road or off-way travel, but would leave stumps and tree debris for decades

that would have "very little similarity to the visual appearance of a wildfire." AR 741. The

BLM suggests using a mix of these treatment methods depending on the location and "in a

manner so as not to impair their suitability for preservation as wilderness." Id. Treatments in

WSAs will be employed in the following order:

> Treatments in high priority areas such as mid- to late-transition juniper
> encroachment sites, aspen, low sage, and riparian areas could initially include use
> of other analyzed tools.
>
> Prescribed fire treatment will be used.
>
> Prescribed fire treatment involving temporary vehicle uses that do not create
> undue or unnecessary surface disturbance will be employed.
>
> During the 3- to 5-year interval project review, additional methods, including
> temporary use of motor vehicles cross-country and juniper cutting or other
> mechanical treatment could be considered if wildland fire use and prescribed fire

treatment did not achieve objectives.  Unnecessary and undue degradation will be
avoided.

AR 370.

The BLM contends that the project will "protect and enhance wilderness values."  AR
381.  It also believes the project is necessary to "successfully restore landscape-level ecological
health and diversity to areas where juniper expansion has increased to the extent juniper is
resistant to fire, and to restore conditions needed for fire to resume its natural role in limiting
juniper distribution."  Id.  Without treatment, the BLM is concerned "[w]ilderness values
associated with ecological health and diversity will likely decline with continued juniper
expansion."  AR 385.  Specifically, the BLM is concerned about juniper becoming resistant to
wildfires over time or being the victim of stand-replacing wildfires; the negative effect juniper
has on native plants, such as grasses, forbs, shrubs, and aspen groves; and increased soil erosion
and sedimentation into streams caused  by juniper, which may affect fish and wildlife habitat.  In
addition, the BLM notes decreased opportunities for primitive and unconfined recreation with
increased juniper density; and reduction in sage-grouse habitat, crucial mule deer winter range,
and redband trout habitat.

With respect to using prescribed fire in WSAs, the BLM acknowledges that removing
juniper will reduce vegetative screening, thereby affecting the solitude available in WSAs.
However, the BLM suggests that as shrubs return to the burned areas, so would opportunities for
solitude.  Known unnatural features would retain their juniper screening.  Additionally, the BLM
suggests juniper treatment would enhance scenery, by offering "greater diversity of landscapes,"

and primitive and unconfined recreation by improving wildlife habitat, vegetation, wildflowers, and by opening up the landscape to make it accessible.  AR 739.

>2.    The IBLA's Interpretation of the IMP

The IBLA construed the IMP as "in the nature of guidelines and . . . not intended to necessarily provide inflexible constraints" but that "preclude[s] activities that would impair an area's suitability for preservation as wilderness."  AR 13.  The IBLA interpreted the IMP to permit activities that "clearly protect or enhance the land's wilderness values," accepted the BLM's assertion that without addressing juniper expansion "some wilderness values could decline," recognized that the IMP permits prescribed burning, and relied on the fact that juniper cutting would occur as a pretreatment to prescribed burning or only after prescribed burning is deemed unsuccessful.  AR 13-14.  The IBLA recognized, however, that some of the provisions cited by ONDA "could be read as preventing certain of the proposed treatments," but concluded in effect that the purpose of the project trumped those explicit prohibitions.  AR 13.

>3.    Whether the IBLA's Interpretation is Entitled to Controlling Weight

ONDA argues the IMP permits only temporary uses which do not create surface disturbances.  ONDA also argues the BLM failed to explain how treating the juniper in the proposed fashion protects or enhances wilderness values, especially when "vegetation screening" is a wilderness characteristic of the affected WSAs.  Further, the IMP prohibits "vegetative manipulation" except at times not relevant here.  SAR 3956.  ONDA suggests the IBLA impermissibly carved out an exception–not otherwise present–to permit the proposed juniper treatments in WSAs.  It further suggests the IBLA adopted a position inconsistent with its previous interpretation of the non-impairment standard and, as a result, is "entitled to

Page 43 - OPINION AND ORDER

considerably less deference."  See Young v. Reno, 114 F.3d 879, 883 (9th Cir. 1997) (quoting

INS v. Cardozo-Fonseca, 480 U.S. 421, 446 n.30 (1987)).

Although ONDA focuses on the specific language permitting only temporary uses that do

not create surface disturbances, the IMP specifically excepts from this prohibition actions that

benefit a WSA's wilderness values.  The IMP also explicitly permits prescribed fire.  Further, the

BLM employed the IMP's guidance in evaluating the effect of the project on wilderness values.

It listed the reasons for identifying the various areas as WSAs, AR 660-664, and compared the

effects of the proposed action on those wilderness values, AR 738-741, and concluded that, while

vegetative screening would be reduced, other values like recreation and habitat for special

species would be improved.  The IMP allows the agency to undertake actions that it believes

benefit a WSA's wilderness values.  See SAR 3927 ("(4) Uses and facilities that clearly protect

or enhance the land's wilderness values or that are the minimum necessary for public health and

safety in the use and enjoyment of the wilderness values."); SAR 3928 (permitting "[a]ctions that

clearly benefit a WSA's wilderness values through activities that restore, protect, or maintain

these values"); SAR 3956 ("[p]rescribed burning" "may be used where necessary to maintain

fire-dependent natural ecosystems."); AR 3965 (undertake prescribed fire "using caution to avoid

unnecessary impairment of an area's suitability for preservation as wilderness"); AR 3965 ("Fire

is a natural component of many wilderness ecosystems and fire plans need to give serious

consideration to this fact before recommending one fire management technique over another").

Further, with respect to pretreatment juniper cutting, the section of the IMP directed at vegetative

manipulation specifically permits prescribed burning, and the section on prescribed burning

anticipates that staff will have to make decisions about how best to carry out the prescribed burn. See SAR 3965 (conduct prescribed fire in accordance with fire plans).

Finally, I am not convinced by ONDA's simple assertion that the IBLA's interpretation of the IMP, to permit juniper treatments in conjunction with prescribed burning, is different from any past interpretation.  Without reference to a decision IBLA made that is different from the one here, I defer to the IBLA's reliance on the overarching allowance for actions that benefit a WSA's wilderness values.  SAR 3927, 3928.[14]

However, I do take issue with the IBLA's failure to grapple with the specific language in the IMP limiting vegetative manipulation in WSAs.  The BLM proposes that after a three to five year review, the BLM may undertake juniper cutting or other mechanical treatment in WSAs if prescribed fire is unsuccessful, but the BLM's proposal is not permitted by the IMP.

Specifically, Chapter III of the IMP provides:

Vegetative manipulation by chemical, mechanical, or biological means *will not be permitted* except:  (1) plantings or seedings established before October 21, 1976 may be maintained but not expanded; (2) activities that qualify under the manner and degree provision for grandfathered grazing uses; and, (3) control of noxious weeds and individual exotic plants such as tamarisk when there is no effective alternative and when control . . . is necessary to maintain the natural ecological balances within a WSA or portion of a WSA. [Western juniper is a native plant.]

In all cases where vegetative manipulation is proposed, the activity must conform to the policy guidance of Chapter II of this manual and not adversely impact wilderness values within any portion of the WSA.

. . . .

_____

[14] ONDA's additional argument that the BLM would be acting contrary to the IMP's prohibition on commercial forest product removal, AR 3960, is contradicted by the record, AR 373, since the ROD explicitly provides that commercial use of cut juniper is allowed only in areas outside WSAs and wilderness areas.

Limited exceptions are specified as follows:

. . . .

– Prescribed burning may be used where necessary to maintain fire-dependent
natural ecosystems.

SAR 3956 (emphasis added).  Chapter II of the IMP directs that the BLM is to consult the

specific guidance in Chapter III first and to "refer to the 'nonimpairment criteria' from Chapter I"

only "[i]f specific guidelines do not address the proposal being evaluated[.]"  SAR 3939.

The IMP language in Chapter III is very inflexible with respect to cutting vegetation in

WSAs.  Compare SAR 3956 ("Vegetative manipulation . . . will not be permitted except: . . .)

with SAR 3955 ("Measures required for watershed rehabilitation, including structures, will be

permitted only if they satisfy the nonimpairment criteria.").  Accordingly, while the IMP can be

read to permit juniper cutting as a pretreatment for prescribed burning, particularly when read in

conjunction with the section of the IMP on prescribed burning, juniper cutting on its own is not

contemplated by the IMP unless the very stringent and explicit conditions are met.  The IBLA's

simple assertion that the "provisions of the IMP are in the nature of guidelines and are not

intended to necessarily provide inflexible constraints" fails to grapple with the mandatory

language of the Vegetative Management section of Chapter III and, as a result, is inconsistent

with the language of the guidelines.  For that reason, I decline to defer to the IBLA's

interpretation of the IMP with respect to juniper cutting that is not a pretreatment to prescribed

burning.[15]  As a result, this very small portion of the project–cutting juniper when not a

pretreatment for prescribed burning in WSAs–is a violation of FLPMA.

        D.     Off-Road Use

ONDA similarly challenges the BLM's plan to permit off-road use.  The BLM proposes

that use off ways "will be the minimum necessary to meet project objectives."  AR 381, 392.

The BLM will use ways currently open to motorized vehicles, as well as exterior roads, before

using off-road routes.  AR 392; see also AR 179 ("Projects would be designed to minimize the

need to use motorized vehicles off existing roads or ways to help reduce vehicle tracks and

potential establishment of unauthorized vehicle routes.").  Additionally, after using an off-road

route, the BLM will rehabilitate the area to "preclude any additional, non-administrative, off-road

travel."  AR 392.  Finally, one of the PDEs reads as follows:

> **34. Road Condition and Maintenance –** Maintain safe conditions throughout
> the duration of the North Steens Project.  Several roads would be maintained
> consistent with assigned maintenance levels.  Roads may be graded, graveled,
> rocks removed, ditches cleaned, and culverts or rock crossings installed to prevent
> accelerated erosion and to provide easier access for firefighting personnel and
> administration.

AR 600.

The IMP generally prohibits "surface disturbing" activities and explains that "[c]ross-

country vehicle use off boundary roads and existing ways is surface disturbing because the tracks

created by the vehicle leave depressions or ruts, compact the soils, and trample or compress

vegetation."  SAR 3927.  The IMP more specifically provides:

---

[15]Indeed in the administrative record, BLM staff reported, "I am aware of an area that was
eliminated from WSA consideration during inventory because of the evidence of 100 year old
juniper stumps."  AR 1493.

11.    <u>Motor Vehicles, Aircraft and Mechanical Transport</u>.  Motor vehicles and mechanical transport may be allowed off boundary roads and existing ways for these purposes only:

. . . .

b.  *for official purposes by the BLM* and other Federal, State, and local agencies and their agents *when necessary* and specifically authorized by the BLM for protection of human life, safety, and property; *for protection of the lands and their resources*; and

. . . .

In emergencies, cross-country travel [which is defined to mean "travel that is not on existing access routes (ways, trails, boundary roads) and involves surface disturbance caused solely by the passage of vehicles"] will not be held to the nonimpairment standard; but in all other cases, cross-country travel is allowed only where it is specifically authorized by BLM and it satisfies the nonimpairment criteria.

SAR 3933, 3967 (emphasis added).  The IBLA relied on the "official purposes" exception to off-road and off-way motor vehicle use and concluded that the proposed project was consistent with the IMP.

ONDA takes issue with the IBLA's reliance on the "official purposes" exception to off-road and off-way use; it argues any BLM action would be an "official purpose" and would undermine the overarching principle in the IMP that "preservation of wilderness values within a WSA is paramount."  SAR 3926.  Additionally, ONDA questions whether the off-way use is "necessary" to carry out the project, as is required by the exception.  Finally, ONDA questions how the proposed grading, graveling, and other road "maintenance" proposed by PDE 34 is permissible under the IMP.

The BLM confirms that the method of treatment–fall and leave juniper cutting that does not involve burning–will not use vehicles off existing roads and ways.  AR 741; BLM's Cross-

Page 48 - OPINION AND ORDER

Mot. at 35. With respect to the other treatment methods, the BLM recognizes that "some use of motorized vehicles to travel cross-country off-existing ways" will be necessary. AR 740. BLM asserts it will use all currently open ways and exterior roads "prior to using any off-road routes," and it will rehabilitate off-road routes following project implementation. AR 392. The BLM also promises it will control the timing, routes and equipment to be "the minimum necessary to meet project objectives, and the project would be designed in a manner to minimize vehicle tracks and potential establishment of unauthorized vehicle routes." AR 740.

Although I, too, am somewhat concerned about the seemingly broad authorization of the "official purposes" exception to off-road and off-way vehicle use, ONDA fails to identify any reason for me to find the IBLA's interpretation is inconsistent with the IMP. At face value, the guideline permits BLM to undertake off-road and off-way travel for official purposes when it is for protection of the lands and their resources; the BLM also explains that such travel may be necessary for firefighter safety. AR 392. The BLM contends the Juniper Treatment Project is for the protection of the WSAs and I have no reason to question that conclusion.

Moreover, and this is not something briefed by the parties or relied on by the IBLA, it seems to me that the IMP provisions on prescribed fire anticipate and permit off-road or off-way travel and rely on BLM to make appropriate decisions. See SAR 3965 ("prescribed fire . . . activities in accordance with . . . plans," "use the fire plans in making decisions during . . . prescribed ignitions," "All uses of earth moving equipment within a WSA require authorization," "Use of motorized vehicles and mechanical equipment during mop-up should be minimized" and "In planning firebreaks, the use of natural firebreaks and existing roads is encouraged." ).

Page 49 - OPINION AND ORDER

Lastly, although PDE 34 is confusing in its proposed maintenance of roads, the BLM asserts it has "no intention" to maintain WSA "ways" in a manner that they become "roads." "Ways" would only be repaired by working to address unsafe conditions, or removing limbs, trees or rocks. Use both on and off existing ways will be the minimum necessary to meet project objectives. AR 202 at ¶ 4. I hold the BLM to these statements.

  E. <u>Conclusion</u>

With the small exception of cutting junipers in WSAs after it has tried prescribed fire–which is not permitted by the IMP–the Project satisfies the nonimpairment criteria as set forth above. The BLM and IBLA did not err.

III. <u>The Steens Act</u>

  A. <u>Background</u>

ONDA alleges the BLM violated the Steens Act by proposing off-road vehicle use in WSAs and by proposing performing maintenance on roads during the course of the project. The Steens Act strictly limits motorized and mechanized vehicles in the CMPA's public lands. 16 U.S.C. § 460nnn-22(b)(1). The relevant statutory language reads as follows:

**(b) Prohibition on off-road motorized travel**

  **(1) Prohibition**

  The use of motorized or mechanized vehicles on Federal lands included in the [CMPA]--

    **(A)** is prohibited off road; and

    **(B)** is limited to such roads and trails as may be designated for their use as part of the management plan.

  **(2) Exceptions**

Page 50 - OPINION AND ORDER

Paragraph (1) does not prohibit the use of motorized or mechanized vehicles on Federal lands included in the [CMPA] if the Secretary determines that such use –

**(A)** is needed for administrative purposes or to respond to an emergency; or

(B) is appropriate for the construction or maintenance of agricultural facilities, fish and wildlife management, or ecological restoration projects, except in areas designated as wilderness or managed under the provisions of section 1782(c) of title 43.

. . . .

**(d) Prohibition on new construction**

**(1) Prohibition, exception**

No new road or trail for motorized or mechanized vehicles may be constructed on Federal lands in the [CMPA] unless the Secretary determines that the road or trail is necessary for public safety or protection of the environment. Any determination under this subsection shall be made in consultation with the advisory council and the public.

Id. at § 460nnn-22.

Additionally, the Steens Act required the Secretary of the Interior to prepare a land use plan "for the long-range protection and management" of Steens Mountain. Id. at § 460nnn-21(b). The plan must include a transportation plan, dealing with maintenance, improvement and closure of roads and trails. Id. at § 460nnn-22(a).

B.    Off-Road Use in WSAs

ONDA complains that the EIS permits cross-country vehicle use to access units and to carry out treatments in violation of the Steens Act. AR 392, 606-07, 740.[16]

_____

[16] BLM suggests ONDA failed to appeal this issue. I disagree. In ONDA's Supplemental Statement of Reasons it filed with the IBLA, ONDA complained that the "agency plans to . . .

(continued...)

The BLM responds that the Steens Act expressly allows agency off-road use for administrative purposes.  16 U.S.C. § 460nnn-22(b)(2)(A).  Here the administrative purpose the BLM is carrying out is the explicit direction that it manage juniper on a landscape level.  Indeed, the Steens Act specifically provides:

> JUNIPER MANAGEMENT.–The Secretary shall emphasize the restoration of the historic fire regime in the [CMPA] and the resulting native vegetation communities through active management of Western Juniper on a landscape level. Management measures shall include the use of natural and prescribed burning.

Id. at § 460nnn-23(c).  The BLM asserts it is "carefully limiting any motorized travel off ways in WSAs to the minimum necessary and providing for rehabilitation of any route used."  AR 392.

ONDA argues the BLM misunderstands; the general authorization of off-road travel within WSAs in the ROD "for administrative purposes" is invalid because it conflicts with the more specific prohibition against off-road use in WSAs in conjunction with ecological restoration projects in Section 112(b)(2)(B) of the Act.  16 U.S.C. § 460nnn-22(b)(2)(B).  The specific governs the general.  For the project named "Ecosystem Restoration Project," off-road access must be governed by the statutory provision related to "ecological restoration projects," which is Section 112(b)(2)(B), and that section precludes such off-way use in WSAs.

The BLM replies that the first exception for "administrative purposes" is different from the second exception for "ecosystem restoration."  The second exception is applicable when, through cooperative cross-boundary management, private parties need to undertake restoration projects for which access may be needed.  The two exceptions apply to different situations.

---

[16](...continued)
permit off-route travel in contravention of the Steens Act[.]"  AR 165; see also AR 171, 188 (further citation to Steens Act provisions, arguing they prohibit off road motorized travel).

The IBLA did not rule on this issue so I do not have the benefit of its interpretation.  I do note, however, that both the BLM and the IBLA in the administrative proceeding invoked the "ecological restoration" exception, as opposed to the "administrative purposes" exception, in justifying the BLM's use of mechanical vehicles off-road in the non-WSA portion of the CMPA.  AR 15, 33.  As set forth above, that exception does not apply in WSAs.  Having suggested that off-way use in non-WSAs is permitted for "ecological restoration projects," I question the BLM's reliance on the other exception for off-way use in WSAs.  In conjunction with the BLM's and IBLA's implied construction of the statutory language, I also point out that nothing in section (b)(2)(B) expressly limits that exception to private restoration projects and the BLM fails to include any legislative history supporting such an interpretation.  Since ONDA administratively exhausted this issue, but the IBLA failed to issue a ruling on the dispute, I remand this portion of the IBLA's decision to the agency for further explanation.  On remand, the IBLA must address this legal issue.

      C.    Off-Road Maintenance

ONDA argues that the project improperly allows for maintaining or improving access for heavy equipment, to serve as fire lines, and to repair damage from "heavy [vehicle] use" during treatment actions.  AR 392, 600-01, 606, 750.  ONDA also argues that such "maintenance" and "improvement" of motorized vehicle routes is unlawful because the BLM inappropriately refers to its Transportation Plan, which ONDA argues has been held to be unlawful.  Specifically, in the EIS, the BLM indicates it will carry out maintenance consistent with "assigned maintenance levels" in the agency's Transportation Plan.  AR 600.

The parties bicker about the meaning of the court's opinions in <u>Or. Natural Desert Ass'n</u> <u>v. Shuford</u>, No. 06-242-AA, 2007 WL 1695162, at *19 (D. Or. June 8, 2007); <u>Or. Natural Desert</u> <u>Ass'n v. Shuford</u>, No. 06-242-AA (D. Or. July 8, 2008) (remedial order); and <u>Or. Natural Desert</u> <u>Ass'n v. McDaniel</u>, No. 09-369-PK, 2011 WL 1654265, at * 13-14 (D. Or. Apr. 28, 2011), <u>opinion amend. on recons.</u>, 2011 WL 3841550 (D. Or. July 8, 2011).  ONDA argues that these opinions found the BLM's transportation plans unlawful, while the BLM argues the courts declined to vacate the Transportation Plan in the case of <u>Shuford</u>, and declined to vacate the Transportation Management Plan in the case of <u>McDaniel</u>.

In an opinion subsequent to the briefing and argument in this case, the court in <u>McDaniel</u> clarified its decision as follows:

> This court . . . explicitly declined to find any violations of the substantive environmental statutes alleged by ONDA.  Consequently, this court vacated the IBLA's decision, but not the underlying TMP and associated environmental analyses, and remanded for further proceedings before the agency.  Next, upon reconsideration, this court altered its previous decision and remanded the action back to the agency for further explanation *without* vacating the IBLA's decision. Additionally, the court determined that, pending a new decision by the IBLA, a temporary injunction on mechanical route maintenance was necessary to prevent BLM from effectively creating new routes under the guise of route maintenance.
>
> . . . .
>
> [The court] adopt[ed] BLM's proposal [with respect to route maintenance]. Accordingly, pending a new decision by the IBLA, BLM shall limit mechanical maintenance activities within the CMPA as described in its proposal for temporary injunction and associated maps and spreadsheets.

<u>Or. Natural Desert Ass'n v. McDaniel</u>, No. 09-369-PK, 2011 WL 3793710, * 1-2 (D. Or. Aug. 25, 2011).

Thus, contrary to ONDA's argument, the BLM is not authorizing road maintenance on routes which have not yet been designated in a lawful travel management plan.  The BLM is entitled to summary judgment on this issue.

## CONCLUSION

For the foregoing reasons, I grant in part and deny in part ONDA's Motion for Summary Judgment [47] and BLM's Cross-Motion for Summary Judgment [63].  ONDA's Motion for Temporary Restraining Order/Motion for Preliminary Hearing [46] is denied as moot, and its Motion to Supplement the Administrative Record [86] is granted given the BLM's agreement to include in the administrative record the materials requested by ONDA.

I find the BLM is not required to issue a supplemental EIS with respect to the sage-grouse publications, but it is required to evaluate the significance of the Greater Echanis project in light of the East and West Ridge portions of the project constituting "reasonably foreseeable" actions. In addition, because I find the IMP prohibits vegetative manipulation when not a pretreatment for prescribed burning, the IBLA's decision is arbitrary and capricious on this issue and the BLM is not permitted to undertake such actions.  Finally, the IBLA decision is remanded to the Department of Interior to address ONDA's argument that the off-road motorized use in WSAs contemplated by the Juniper Treatment Project is a violation of the Steens Act.  The parties are to confer on a proposed form of judgment and submit it to the Court by December 5, 2011.

///

///

///

Page 55 - OPINION AND ORDER

IT IS SO ORDERED.

DATED this _____15th_____ day of November, 2011.


                                    /s/ Garr M. King_____
                                    Garr M. King
                                    United States District Judge